JOHN H. B. LATROBE ET AL.
vs.                          }  MARCH TERM, 1851.
WILLIAM H. TIERNAN ET AL.

———

[LACHES—POWERS AND DUTIES OF TRUSTEES.]

———

*S.* and *G.* were in July, 1836, by agreement of parties, and with the consent of the Chancellor, constituted trustees to receive and invest, *pendente lite,* a certain sum of money detained in court by appeal. The money was paid to them jointly, and they gave a joint receipt therefor, and loaned $5000, part thereof, to *T.,* who secured the same by a mortgage of certain real estate to *S.* and *G.* jointly. The mortgagor paid interest from time to time to *S., one* of the trustees, and in 1841, his executors, he having previously died, paid the entire principal to *S.,* and the mortgage was released by *S.* alone. The payments to *S.* were without the knowledge, privity or consent of *G.,* who was also ignorant of the release. The appeal was decided in 1838, but no application was made for a distribution of the fund, by those entitled to it by the decision on the appeal, until 1843, when a petition was filed, requiring the trustees to account, and seeking to make *G.* responsible for the amount received by *S.,* and which he had misapplied. The court of appeals in 1845, decided that *G.* was not responsible, for the reason, among others, of the delay of the petitioners in asserting their claim, and it was not until 1848, *ten* years after the decision on the appeal; and after the insolvency and death of *S.,* that this bill was filed by the original petitioners or the parties representing them, against the defendants, the executors of *T.,* and their alienees, seeking

a sale of the mortgaged property for the payment of the mortgage debt, upon the ground that no part of the same had been paid according to the terms of the mortgage : it was HELD—

That if G. might rely upon the laches of the petitioners to protect himself from their claim to make him answerable for the default of S., his co-trustee, these defendants may claim exemption from loss, upon the same ground, with equal, if not more, reason, when an attempt is made to compel them to pay a debt a second time which they have once honestly paid.

As a general rule, trustees have all equal power, interest and authority, and cannot act separately as executors may, but must join in any sale, lease or other disposition of the trust property, and also in receipts for money payable to them in respect of their office.

Trustees are in general responsible only for their own acts, and not for the acts of each other, unless they have made some agreement, by which they have engaged to be bound for each other, or have by their own voluntary co-opera-tion, or for their convenience, enabled some of them to violate the trust.

Property in the hands of a *bona fide* purchaser, from executors, who have pow-er to sell, will be protected by compelling the executors, if they have assets to pay the claims against it.

———

[The bill in this case was filed on the equity side of Balti-more County Court, on the 28th of April, 1848, and alleges, that by an order passed in the High Court of Chancery, upon a certain agreement, made on the 22d of July, 1836, in a cause in said court, between Joseph McKim, plaintiff, and Joseph M. McKim and others, defendants, John Scott and John Glenn were appointed trustees for receiving and investing certain moneys belonging to the estate of Samuel McKim, deceased, with the purpose and intent, that they should pay over the same into the said court, with all interest and profits which might have accrued thereon, when the rights of the several parties who claimed an interest therein, should be finally determined; that the right to receive said sum of money, was afterwards determined to belong to the complainants, Joseph McKim, James Guest and Mary his wife, Charles F. Mayer, trustee for William A. McKim, Alexander McKim and Jane Hutchinson, and also to T. Parkin Scott as trustee for Margaret Fisher, and to John Scott as administrator of Joseph M. McKim ; that said T. Parkin Scott, afterwards ceased to act in, and was released from, his trusteeship, as aforesaid, and no new trustee was ap-pointed in his place, but the interest of said Margaret Fisher,

one of the complainants, was conveyed to her by the said T. P. Scott, and that said John Scott, administrator of Joseph M. McKim, afterwards died, and administration *de bonis non* upon said estate, was, on the 17th of October, 1843, granted to the complainant, William A. McKim.

The bill further charges, that John Glenn and John Scott, trustees as aforesaid, on the 1st of August, 1837, loaned $5,000 of the trust money for the space of six months, to Luke Tiernan, and to secure the same, said Tiernan executed to the said John Scott and John Glenn, a mortgage of certain real estate, lying in the city of Baltimore, conditioned for the payment by said Tiernan, to said John Scott and John Glenn, trustees as aforesaid, of the said sum of money, and interest thereon from the said 1st day of August to 1st day of February, 1838. A certified copy of this mortgage is filed with the bill. The bill then states and charges, that said Tiernan afterwards died, and by his will, executed on the 9th of October, 1839, appointed Alexander Neill, and W. Tiernan Somerville, his executors, who, by virtue of the authority in them reposed, sold at private sale, on the 26th day of May, 1841, their testator's interest in said mortgaged premises to one William H. Tiernan, and that said Neill and Somerville, before executing any deed to said William H. Tiernan, joined with him in a deed, dated the 4th day of September, 1841, conveying their several rights and interests in said property to William H. Tiernan and Charles Tiernan, in trust for the use of Guy R. Tiernan, the wife of said Charles Tiernan. That said John Scott, afterwards, about the 28th of August, 1843, died, leaving said John Glenn, sole trustee of the premises mortgaged as aforesaid, and that said Glenn was, by an order passed in said cause on 17th of April, 1848, removed from the trust aforesaid, and the complainant, John H. B. Latrobe, was thereby appointed sole trustee, to execute and perform the objects of said trust. The bill then charges, that said sum of $5,000, was not paid at the time limited in the mortgage, nor afterwards to said John Scott and John Glenn, neither by the said Luke Tiernan in his lifetime, nor by his executors after his death, and that the said loan, with interest

thereon, remains unpaid, and prays for a sale of the mortgaged premises to satisfy the same. The defendants to this bill, one Charles Tiernan, William H. Tiernan, Guy P. Tiernan, Alexander Neill and W. Tiernan Somerville.

The defences taken in the answer, are, that the executors of Luke Tiernan, paid Scott, on the 11th of February, 1841, $1,000, and on the 29th of May, $4080, which last was in full of the mortgage debt, and that the mortgage was released by Scott; that the complainants by their laches and lapse of time, have forfeited their title to relief, and that the claim is barred by limitation.

The case was removed to this court, and argued on notes by the solicitors of the respective parties.]

THE CHANCELLOR:

The proceedings in this case, show, that on the 4th of May, 1835, a decree passed in this court, for the sale of the real estate of Samuel McKim, deceased, upon a bill filed by Joseph McKim, and, that the trustees thereby appointed, did make sale of the property, and brought the proceeds into court. That difficulties being interposed to the distribution of a portion of the money, by reason of an appeal taken from the order of the Chancellor, an agreement was entered into by the parties interested, on the 22d of July, 1836, by which it was stipulated, by and with the consent of the Chancellor, that John Glenn and John Scott, of the city of Baltimore, be constituted trustees, to receive and invest the portion of the proceeds in relation to which the controversy existed, amounting to $10,695 48, and that upon the final hearing of said appeal, the said Glenn and Scott, should pay into the Court of Chancery, the said sum of money, and all interest and profit which should accrue thereon, subject to the order and decree which might be passed on the appeal.

Upon this agreement, the Chancellor, on the 23d of July, 1836, passed an order, directing the register to draw a check on the Farmers' Bank of Maryland, in favor of said Scott and Glenn, for said sum of money to be invested during the pen-

dency of the appeal spoken of in the agreement, and on the same day a check was drawn accordingly, which it appears by the receipt of Messrs. Glenn and Scott, was received by them on the 27th of the same month, and the check was presented and paid at bank on the 30th.

A portion of the money was loaned by Scott and Glenn to Alexander Brown & Sons, in August of the same year, and for the portion so loaned, with the interest thereon, Mr. Glenn has duly accounted. Another portion, to wit, $5,000, was loaned to one John H. Hunter, which, being repaid with interest on the 31st of July, 1837, was, on the day following, to wit, the 1st of August, 1837, loaned to Luke Tiernan, of Baltimore, upon his promissory note, payable six months after date, with interest, secured by a mortgage on real estate in the city of Baltimore.

The proceedings further show, that Tiernan paid Scott the interest on this sum, to the 1st of August, 1839, and the former having died in the course of that year, one of the executors having previously paid to the same party, the interest and a portion of the principal, on the 29th of May, 1841, paid him the entire balance of principal and interest, amounting at that time, to $4,080. The Chancellor's order, distributing the money, was affirmed by the Court of Appeals at its June term, in the year 1838, but no proceedings appear to have been taken by the parties, who, by this affirmance, were decided to be entitled thereto, until March, 1843, when they filed a petition in the cause, requiring the said Scott and Glenn, to account; when it appeared by their answers, and the admissions of the parties, that the money paid to Scott by Tiernan and his executor, was paid without the authority, privity, consent, or knowledge of Glenn, and that the latter in no way participated in receiving such money, or indorsing the note given for its security, or in releasing the mortgage, which appeared to have been released by Scott alone, on the 2d of December, 1841.

The money received by Scott from Tiernan and his executor, having been wasted or misapplied, the question raised upon the

petition of March, 1843, and the answers and other proceedings thereon, was, whether Glenn was responsible therefor, and the Chancellor having so decided, Mr. Glenn appealed to the Court of Appeals, and the latter court, at its December term, 1845, reversed the Chancellor's order, being of opinion, that under the circumstances of the case, there was no just ground upon which Glenn could be made answerable. Subsequently, to wit, on the 17th of April, 1848, upon the petition of the parties in interest, an order passed, with the consent of Glenn, removing him, from what in said order is called the trust, created by the order passed upon the agreement of the 22d of July, 1836, and appointing John H. B. Latrobe, trustee, for the purpose of executing so much of said trust, as yet remains to be performed, and requiring said Glenn to yield up, assign and deliver, all securities, deeds and conveyances belonging to said trust.

And, thereupon, on the 28th of April, 1848, the present bill was filed by Mr. Latrobe, and the parties entitled to the money, seeking to charge the mortgaged premises with the payment thereof, upon the ground that no payment has been made. The defendants to this bill are the executors of the mortgagor, and those who claim under a sale of the mortgaged premises, made by them, under the provisions of his will, and the main question is, whether under all the circumstances of the case, the estate of Mr. Tiernan, or rather the mortgaged premises in the hands of the purchasers, can be made to pay this debt a second time. The evidence shows that the note of Tiernan, secured by the mortgage, was kept by Mr. Scott, and upon the death of the former, it was passed by the Orphan's Court, upon the affidavit of the latter ; and that when the balance of the money was paid, Scott surrendered it to the executors, who made the payment.

In the argument of the case in the Court of Appeals, upon the appeal of Glenn, an effort was made to show, that the proper and only remedy open to the parties who were entitled to the money, was by a proceeding against the mortgaged property, upon the ground that the receipt and release of Scott

alone, was no exoneration thereof. But the court refrained from intimating any opinion upon the question, the parties interested in the mortgaged premises not being before them. These parties are now here, upon this bill, and the question is, and it is certainly a very interesting one, whether the mortgaged property is liable to be sold for the payment of the debt, notwithstanding it has been once paid.

The general doctrine does not appear to admit of dispute, that trustees have all equal power, interest, and authority, and cannot act separately, as executors may, but must join, both in conveyances and receipts. For one trustee cannot sell without the other, or make a claim to receive more of the consideration money. As a general rule, says *Hill on Trustees*, 305, "trustees cannot act separately, but they must all join in any sale, lease, or other disposition of the trust property, and also in receipts for money payable to them, in respect of their office." And the cases, so far as I have been referred to them, are uniform in maintaining this as a general rule. They are referred to in the passage quoted from Hill, and in *2d Story's Eq.*, section 1280, *in the notes*. As trustees, then, are in general required to join in receipts of money and conveyances, or other dispositions of the trust estate, they are only responsible for their own acts, and not for the acts of each other, unless they have made some agreement by which they have engaged to be bound for each other, or they have, by their own voluntary co-operation, or connivance, enabled some one or more of them to violate the trust. In the case of *Glenn* vs. *McKim*, *in* 3 *Gill*, 366, the Court of Appeals, in commenting upon the cases in which trustees have been held responsible for the acts of each other, because of co-operation, or connivance, or remaining passive, and declining to act, when aware of an abuse of the trust by one of them, excused and exonerated Mr. Glenn, on account of the misapplication of the trust fund by Scott, because there was no charge or proof of such co-operation, connivance, or knowledge of abuse on his part, as could make him responsible. The Chancellor held Glenn liable, because, in his opinion, by the act of the court, founded upon the

agreement of the parties, he and Scott were judicially constituted joint trustees, and as such, jointly liable for the whole amount of money received by them. The Court of Appeals appear rather to dissent from the idea, that the appointment could be regarded as a judicial one, and seemed more disposed to regard it as having been made by the parties themselves; but they say, viewing it in either light, Glenn should not be held responsible for the default of Scott, because the circumstances were such as to exonerate him from all blame in reference thereto. He had neither done nor omitted to do any thing which could, upon any just principle, render him liable. He had been guilty of no act of commission or omission, by which Scott had been in any degree facilitated, in wasting the estate.

But, say the court, though Glenn has done nothing of which the petitioners in that case, could, with justice, complain, were they altogether free from censure? that is, had they not, by their negligence and delay, caused the loss of the money which they were then attempting to throw upon Glenn?

The order of the Chancellor, distributing the funds, was affirmed by the Court of Appeals, at its June term, 1838, and it was not until March, 1843, nearly five years afterwards, that the petitioners took any steps to recover the money from either Scott or Glenn. The whole amount of the money loaned Tiernan, had been received by Scott, as early as May, 1841, a portion of it before that time, and it may very well be, and indeed it is not by any means unreasonable to suppose, that if these parties had proceeded promptly after the decision of the Court of Appeals in 1838, the money would have been properly applied, and there would have been no loss at all. It was in this state of circumstances, that the court ask the very significant question, "may not Glenn claim the benefit of the maxim *vigilantibus non dormientibus leges subveniunt?*" "So far as we can judge, (say the court,) it was owing to the petitioners entirely—owing to their remissness in procuring a revocation of the Chancellor's order, by which the money was to be retained, *pendente lite,* that the default of Scott remained

42

a secret until he became insolvent, and it may be, until his death gives to others a right to claim a portion of the fund to which he, as administrator of one of the complainants, was himself entitled."

Now, if Glenn might rely upon this negligence on the part of the petitioners, to protect himself from their claim, to make him answerable for the default of Scott, may not these defendants claim exemption from loss, upon the same ground, with equal, if not with more, reason? The court rely in that case, as a reason among others, why Glenn should not be made responsible for the default of Scott, upon the fact, that Scott was not selected by Glenn, as his associate. That they might have required, but did not demand security, either by way of a joint bond, in which each would have been bound for the other, or in several bonds, the bond of each being liable for the misconduct of the principal obligor in it. That reposing confidence in Scott, they dispensed with security altogether, and that this was a circumstance which might fairly be relied upon by Glenn, when an attempt was made to charge him with the default of his associate. Reliance was also placed upon the fact, that Scott was the solicitor in the Court of Chancery for the parties, who were adjudged to be entitled to the money, and as such, had the management of the original suit. That he also appeared for them in the Court of Appeals, was the agent of several, administered upon the estate of one, and had the orders of some of them to receive the money to which they were entitled, and that if the money received by him, had been brought into court, and a distribution thereof directed, he would have been entitled, as solicitor, agent and administrator, to receive a larger amount than he wasted. These circumstances were relied upon by the Court of Appeals, as some of the grounds for their judgment, exonerating Glenn from the default of Scott, and it appears to me, they lose none of their force, when applied to the case of the present defendants. If in consequence of the neglect of these parties (who are substantially the same as the petitioners in the case against Glenn) to take security in one of the forms spoken of by the Court of Appeals,

the money has been lost; if Scott, being their selected and trusted agent and solicitor, wasted the money, which their confidence in him enabled him to receive; and if this conduct on their part could be regarded, in considering the responsibility of Mr. Glenn, his associate, and furnished a reason why he should not be held answerable, surely the same facts are not to be entirely overlooked, when an attempt is made to compel parties who have honestly paid a debt, to pay it a second time. It has been already remarked, that in deciding the case upon the appeal of Glenn, the Court of Appeals refer, with emphasis, to the maxim, that the vigilant and not the slothful are the favorites of the law, and apply it with great force against the petitioners, because they omitted to procure (as they might have done) a revocation of the order of the Chancellor, suspending the distribution of the money, by which the default of Scott remained a secret, until he became insolvent, and, perhaps, until his death should give to others a right to claim that portion of the fund, to which, as administrator of one of the complainants, he was entitled.

But if the maxim could be pressed against the petitioners at that time, it may certainly be urged now with duplicated force. The petition was filed in March, 1843, being only five years after the decision of the Court of Appeals in 1848, settling the rights of the parties. The bill, in this case, was not filed until April, 1848, five years later, being ten years from the period when, by the judgment of the court, the right of these plaintiffs to the money was finally adjudicated. If sleeping upon their rights for five years, exposed them to the imputation of negligence, surely their supineness for an additional five years, should not render the court more disposed to grant them relief. If they had moved with more alacrity, the insolvency of Scott, which took place between 1838 and 1843, might not have presented an obstacle to the recovery of the money from him, and if so, there would have been no loss. But, say the court, you have slumbered over your rights, thus preventing the default of Scott from becoming known until he became insolvent, and, therefore, you have no right to look to Glenn, to

save you from loss, which, but for your own negligence might not have occurred. At the time of the controversy between these parties and Glenn, though the insolvency of Scott had taken place, he was still living. Since then, he has died, and administration, *de bonis non,* on the estate of the party whose administrator he was, has been granted to another, and thus the very event has occurred, of which the Court of Appeals spoke when they said, his death might give to others a right to receive that portion of the fund, to which, as administrator of one of the complainants, he was entitled. The proceedings in the case upon the petition against Glenn, and for the sale of the real estate of Samuel McKim's estate, a portion of the proceeds of which constitute the subject now in dispute are referred to in the bill in this case, and form a part of the record.

There is, however, as I conceive, another very strong objection to granting the relief prayed by this bill. It is a bill for the foreclosure and sale of the property mortgaged by Tiernan to Scott and Glenn, upon the allegation, that no part of the money has been paid; and that by virtue of the proceedings in the cause referred to, the complainants are to be regarded as having authority to sue upon it, without making either Glenn or the representatives of Scott, parties. The bill alleges that Tiernan, the mortgagor, by his will, executed in October, 1839, appointed Alexander Neill and W. Tiernan Somerville, his executors, and that they, in virtue of the authority thereby reposed in them, sold the mortgaged property in May, 1841, to William H. Tiernan, and that the executors joined with the purchaser in September of the same year in conveying said property to William H. Tiernan, and Charles Tiernan, in trust for the sole and separate use of Gay R. Tiernan, wife of said Charles Tiernan. The defendants to the bill are Charles Tiernan, William H. Tiernan, Gay R. Tiernan, Alexander Neill, and W. Tiernan Somerville; and its prayer is, for a sale of the mortgaged property for the payment of the debt and for general relief. Now, nothing, it is thought, can be clearer than that this property, in the hands of a *bona fide* purchaser, from the executors, who had power to sell, should be

protected by compelling the executors, if there are assets, to pay the claim. If blame attaches anywhere, it is to them for paying the money to Scott alone, and not to Scott and Glenn. The misapplication (if any) was the consequence of their act, and not the act of their vendee, and surely, therefore, the latter should be protected at least, until their inability to make good the loss is ascertained. But the bill does not make a case, nor is there anything in the evidence upon which any such relief can be granted under the general prayer; and as Tiernan, the mortgagee, died as far back as 1839, it may very reasonably be presumed his estate has been settled up, and the assets distributed.

I am of opinion, therefore, that the complainants are not entitled to relief, and shall dismiss the bill; but as there is hard ship in the case on both sides, shall do so, without costs.

CHARLES J. M. GWINN for Complainants.
WILLIAM SCHLEY and JOHN NELSON for Defendants.